1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10
11

DAVID E. McMILLAN, JR.,

No. 2:14-cv-01359-TLN-KJN

12
Plaintiff,
13
v.

**ORDER**

14
VALLEY RUBBER & GASKET
15 COMPANY, INC., et al.,
16
Defendants.
17
18       This matter is before the Court pursuant to two separate motions by Defendants Lewis-

19 Goetz and Company, Inc. ("Lewis-Goetz) and Valley Rubber & Gasket Company, Inc. ("Valley

20 Rubber").  The Court will refer to Lewis-Goetz and Valley Rubber collectively as the "Company"

21 for purposes of these motions.[1]  The first is the Company's motion to compel Plaintiff David

22 McMillan ("Plaintiff") to undergo a mental examination and to modify the scheduling order to

23 allow time for this examination ("Motion to Compel").  (ECF No. 43.)  The second is the

24 Company's Motion for Summary Judgment.  (ECF No. 49.)  For efficiency's sake, the Court will

25 analyze the Motion for Summary Judgment first.  For the reasons set forth below, the Motion for

26 Summary Judgment is DENIED and the Motion to Compel is GRANTED.

27

28
[1]       Valley Rubber merged into Lewis-Goetz effective December 31, 2013, and ceases to exist as a separate legal entity.  (ECF No. 53-1 at ¶ 3.)  Their prior corporate separateness is not material to the instant motions.

1

## I.    INTRODUCTION TO MOTION FOR SUMMARY JUDGMENT

Plaintiff brought this action after his employment with the Company was terminated.  The Company claims it fired Plaintiff due to allegedly unexcused absences during and following his involuntary commitment in a mental institution.  Plaintiff contends the true reason he was fired was his superiors at the Company perceived him to be mentally and physically disabled due to the progression of his Crohn's Disease.  Consequently, Plaintiff claims the Company terminated his employment in violation of California's Fair Employment and Housing Act ("FEHA") and public policy.  Plaintiff also claims that the Company violated FEHA in responding to a serious hand injury he suffered during the course of his employment with the Company.

Before turning to the substance of the motion the Court will briefly discuss Plaintiff's evidentiary objections.  The Company submitted sixteen exhibits attached to its statement of undisputed material facts.  (ECF Nos. 52-1 through 52-16.)  Those exhibits, as initially submitted, totaled 256 pages.  (*See* ECF Nos. 52-1 through 52-16.)  Plaintiff objected to each of these exhibits on the ground that none of them were properly authenticated through an affidavit.  (ECF No. 53-3.)  In response, the Company contends that any such error could be (and was) cured by its "submi[ssion of a] Declaration of Counsel that authenticates the exhibits."  (ECF No. 57 at 2.)  For some unexplained reason, the sixteen exhibits attached to this declaration total 268 pages.  (*See* ECF Nos. 58-1 through 58-16.)  The Company's Motion for Summary Judgment must be denied whether the Court considers the first set of exhibits, the second set, or neither.  For this reason and the unexplained discrepancy, the Court declines to rule on these objections or discuss them further.  For ease of reference, the Court notes that it has cited to the first set of exhibits in this Order.

## II.    FACTUAL BACKGROUND OF MOTION FOR SUMMARY JUDGMENT[2]

In its Sacramento facility, the Company manufactures and assembles heavy weight and

---

[2]    Plaintiff and the Company each submitted separate statements of supposedly undisputed material facts.  The parties submitted 168 enumerated paragraphs between them.  Each filed a response to the other's statement controverting — or at least attempting to — dozens of these paragraphs in whole or in part.  The facts in this section are undisputed unless otherwise indicated.  They are drawn primarily from Plaintiff's response to the Company's statement of undisputed material facts (ECF No. 53-1) and the Company's response to Plaintiff's statement of undisputed material facts (ECF No. 60).

light weight belts used in a variety of industries, hoses used in industrial applications, and gasket materials. (ECF No. 53-1 at ¶ 4.) As part of the Company's Sacramento operations, the Company uses a Water Jet Pro 2031 cutting machine (the "Water Jet") that was designed and manufactured by Flow International Corporation. (ECF No. 53-1 at ¶ 11.)

Plaintiff suffers from Crohn's Disease and has had this condition for more than 19 years. (ECF No. 60 at ¶ 8.) Plaintiff worked in the Company's Sacramento branch as a Water Jet operator from April 2011 until his termination in March 2013. (ECF No. 60 at ¶ 4.) He became the lead operator of the Water Jet in October or November of 2011. (ECF No. 53-1 at ¶ 14.) The essential job functions of that position are in dispute.

Zach Mellon was the production manager and field service coordinator at the Sacramento facility and was Plaintiff's direct supervisor. (ECF No. 53-1 at ¶ 7.) In 2012, Mark Price was the Company's branch manager in Sacramento. (ECF No. 53-1 at ¶ 5.) Toward the end of 2012 he was promoted to sales manager of the Company. (ECF No. 53-1 at ¶ 5.) In 2013, Mr. Price was promoted to be the Company's general manager for the district that included Sacramento. (ECF No. 53-1 at ¶ 5.) Charles "Chuck" Pharaoh succeeded Mark Price as branch manager in Sacramento in August 2012. (ECF No. 53-1 at ¶ 6.) Beginning in November 2012, Christina Hale was the Company's HR manager and was responsible for hiring, benefits, and employee relations. (ECF No. 53-1 at ¶ 9.) Jennifer Belcastro testified that she was responsible for coordinating the Water Jet schedule.[3] (Belcastro Dep., ECF No. 54-11 at 2:3–4.)[4] Merrilee Zeni was responsible for maintaining attendance records and inputting time records into the payroll system in her role as a Strategic Operations Analyst. (ECF No. 60 at ¶ 44.)

On February 25, 2012, Plaintiff suffered an injury to his left hand while operating the Water Jet, which ultimately required emergency surgery at California Pacific Medical Center ("CPMC") in San Francisco. (ECF No. 53-1 at ¶ 17; ECF No. 60 at ¶ 11.) He was off from work for approximately two weeks after the accident, returning March 10, 2012. (ECF No. 53-1 at ¶

---

[3]     The parties dispute whether Ms. Belcastro supervised Plaintiff as she did not possess the authority to discipline him. (*See* ECF No. 53-1 at ¶ 8.)

[4]     The parties have supplied excerpts of various depositions in their submissions. For ease of reference, the page numbers used in citations in this Order are the ECF page numbers.

20.)  After his accident, Plaintiff wore a dorsal blocking cast (with a splint) for six weeks.  (ECF No. 53-1 at ¶ 26.)  On March 16, 2012, Plaintiff met with a doctor at CPMC who provided him with written restrictions prohibiting Plaintiff from taking his left hand out of the splint and ordering no physical use of the left hand or fingers.  (ECF No. 60 at ¶¶ 14–15.)  After the splint was removed in mid-April of 2012, Plaintiff was still under restrictions as to how much weight he could lift with his left hand.  (ECF No. 60 at ¶ 22.)  A report by Dr. Yi Yi Myint, dated April 8, 2013, indicates that Plaintiff should engage in "[n]o heavy lifting over 15–20 pounds with [his] left hand."  (ECF No. 53-1 at ¶¶ 43–44.)  The only accommodations that Plaintiff requested upon his return to work following his hand injury was help doing the physical part of his job as a Water Jet operator.  (ECF No. 53-1 at ¶ 27.)  The parties dispute the extent to which Plaintiff was actually accommodated.

On the evening of February 1, 2013, Zach Mellon called the police to report that Plaintiff was at Mr. Mellon's home behaving strangely.  (ECF No. 60 at ¶ 29.)  This resulted in Plaintiff being involuntarily committed and detained in Heritage Oaks Hospital until February 11, 2013.  (ECF No. 60 at ¶ 29.)  Upon his discharge, his treating mental health professionals did not place any restrictions on him and did not tell him he could not return to work.  (ECF No. 53-1 at ¶ 58.)  However, the Company never permitted Plaintiff to return to work after leaving Heritage Oaks Hospital.  Ostensibly this was for failing to provide a certificate from a doctor indicating that Plaintiff was fit to do so.  The precise nature of what was required of Plaintiff and circumstances surrounding how and when Plaintiff was told of these requirements are disputed.  However, the parties agree that Plaintiff was told that he could not return to work without providing some type of certificate from a doctor and that he was told this no later than mid-February 2013.  (*Compare, e.g.*, ECF No. 53-1 at ¶¶ 57–61 *with, e.g.*, ECF No. 60 at ¶¶ 35–37.)

Ultimately, Plaintiff's employment was terminated effective March 21, 2013.  (ECF No. 53-1 at ¶ 103.)  Mark Price testified the decision to fire Plaintiff was his alone and that he made it solely because of Plaintiff's allegedly unexcused absences.  (Price Dep., ECF No. 52-3 at 16:12, 21:3–8.)  Plaintiff was informed of his termination by a letter sent by Christine Hale on March 25, 2013.  (ECF No. 53-1 at ¶ 101.)  That letter read in pertinent part:

On March 5, 2013, we sent you a letter requiring you to provide medical certification supporting your recent, extended absence from work. You were required to return these documents by March 20, 2013. You were also required to contact our [Employee Assistance Program ("EAP")] provider by March 11, 2013 and comply with any recommended course of treatment.

To date we have not received any medical certification or other documentation supporting your absence from work since February 1, 2013. We have also not received your EAP authorization form or any confirmation that you have contacted the EAP.

As a result of your failure to comply with these requirements and, specifically, to provide any medical evidence supporting your extended absence, and because of your troubling behavior prior to and on February 1, 2013, your absence is unexcused and your employment is terminated March 21, 2013. . . .

(ECF No. 54-9.)

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotations omitted). Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this factual

dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587.

///

///

# IV. ANALYSIS OF MOTION FOR SUMMARY JUDGMENT

The Company moves for summary judgment on each of the first four causes of action in the first amended complaint. (ECF No. 49.) They are as follows: (i) disability discrimination in violation of FEHA; (ii) failure to accommodate in violation of FEHA; (iii) failure to engage in an interactive process in violation of FEHA; and (iv) wrongful termination in violation of public policy. (ECF No. 36.) As discussed in more detail below, the Court finds that Plaintiff has raised triable issues that preclude the Court from granting summary judgment on any of these claims.

## A. First Cause of Action: FEHA Disability Discrimination

The Company argues that Plaintiff's First Cause of Action fails as a matter of law for two separate reasons. First, the Company argues that Plaintiff "is not a 'qualified individual' because he cannot perform an essential function of his job (heavy lifting) either with or without any accommodation." (ECF No. 49 at 2.) Second, the Company argues Plaintiff has "produced no evidence that [the Company's] legitimate, non-discriminatory reason for terminating his employment (two months of unexcused absences) was pretext for a discriminatory animus or intent." (ECF No. 49 at 2.) The Court finds that the Company is not entitled to summary judgment for either reason and will discuss them in turn. However, the Court will first briefly set out the legal standard for a disability discrimination claim under FEHA.

### i. Legal Standard

FEHA makes it "an unlawful employment practice to discharge a person from employment or discriminate against the person in the terms, conditions, or privileges of employment, because of physical or mental disability or medical condition." *Scotch v. Art Inst. of California-Orange Cty., Inc.*, 173 Cal. App. 4th 986, 1002 (2009) (citing Cal. Gov't Code § 12940(a)). The essential elements of a FEHA disability discrimination claim are as follows: (i) "the employee . . . is disabled," (ii) "is otherwise qualified to do the job," and (iii) "was subjected to an adverse employment action because of such disability." *Furtado v. State Pers. Bd.*, 212 Cal. App. 4th 729, 744 (2013). A "qualified individual" within the meaning of the second element "is someone who is able to perform the essential functions of his or her job, with or without reasonable accommodation." *Nealy v. City of Santa Monica*, 234 Cal. App. 4th 359, 378 (2015).

However, "elimination of an essential function is not a reasonable accommodation." *Id*. at 375.

If a defendant employer meets its initial summary judgment burden, the plaintiff may choose to proceed under the burden-shifting framework first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to oppose the motion. *See Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 67–69 (2000). Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination. *Id*. at 68. A *prima facie* case generally means the plaintiff must provide evidence that:

> (1) the plaintiff was a member of a protected class, (2) the plaintiff was qualified for the position he or she sought or was performing competently in the position held, (3) the plaintiff suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests a discriminatory motive.

*Scotch*, 173 Cal. App. 4th at 1004.

If the plaintiff establishes a *prima facie* case, "then a presumption of discrimination arises, and the burden shifts to the employer to rebut the presumption by producing admissible evidence sufficient to raise a genuine issue of material fact [that it] took its actions for a legitimate, nondiscriminatory reason." *Id*. At this stage, "the plaintiff must offer evidence that the employer's stated reason is either false or pretextual, or evidence that the employer acted with discriminatory animus, or evidence of each which would permit a reasonable trier of fact to conclude the employer intentionally discriminated." *Faust v. California Portland Cement Co.*, 150 Cal. App. 4th 864, 886 (2007).

### ii. Whether Plaintiff is a "Qualified Individual"

In its opening brief the Company asserts that it is "undisputed that an essential job function of a Water Jet operator is the ability to lift 50–100 pounds of material onto the table." (ECF No. 51 at 14.) The Company further asserts that Plaintiff "admits he never recovered to where he could load and unload the materials on his own" before he was fired and was "never cleared to lift more than 15–20 pounds with his left hand." (ECF No. 51 at 14 (emphasis removed).) For these reasons, the Company argues that Plaintiff is not a "qualified individual." (ECF No. 51 at 14.) Plaintiff contends whether his essential job functions included being able to

8

lift 50–100 pounds and being able to load and unload heavy materials on his own are disputed questions of material fact. (ECF No. 53 at 14–16.) Whether something constitutes an essential job function for purposes of a FEHA disability discrimination claim is a question of fact. *Hastings v. Dep't of Corr.*, 110 Cal. App. 4th 963, 967 n.6 (2003). Indeed, "[t]he identification of essential job functions is a highly fact-specific inquiry." *Lui v. City & Cty. of San Francisco*, 211 Cal. App. 4th 962, 971 (2012) (internal quotation marks omitted). For the reasons set out below, Plaintiff has raised a triable issue on both points and, therefore, the Company's argument must be rejected.

With respect to the 50–100 pounds figure, the Company cites an email sent by Zach Mellon to Christine Hale. (ECF No. 53-1 at ¶ 15.) The email provides in pertinent part that the essential job functions of a lead operator of the Water Jet are as follows:

> "[The operator] is responsible to load any given materials onto the table . . . . Operation of the jet includes handling heavy materials ranging from 50–100 lbs . . . . The operator of the jet is also usually responsible for overseeing at least one other technician who would be assisting in material handling . . . ."

(ECF No 52-6 at 1.) Additionally, the Company cites a portion of Mark Price's deposition as "confirming [the] accuracy of [the] email describing [the] essential functions of [Plaintiff's] job." (ECF No. 53-1 at ¶ 15 (citing ECF No. 52-3 at 8:10–24).)

The Company's citation to Mr. Price's testimony is misleading. Presumably, this is why Plaintiff block-quoted precisely the same portion of Mr. Price's testimony in his opposition. (ECF No. 53 at 16.) The relevant part reads as follows:

> Q     At the top there is an email from Zach Mellon to Christine Hale in which he describes the essential job functions performed by David McMillan. Can you go ahead and read Mr. Mellon's email and tell me if the email accurately describes the essential functions of Mr. McMillan's job position?
>
> A     I would say everything is pretty accurate. I don't know that we've ever required or constructed [sic] or allowed anyone to pick up 100 pounds.
>
> Q     Okay. *Besides the lifting of 50 to 100 pounds*, everything else appears to be accurate to you?
>
> A     Yes.

(ECF No. 54-16 at 2:13–24.)  Additionally, Plaintiff cites the deposition testimony of Chuck

Pharaoh.  (ECF No. 53 at 15–16.)  The relevant part reads as follows:

> Q        So in terms of the essential functions of Mr. McMillan's
> position as the lead operator of this water jet cutting machine, was
> he required to be able to lift up to 60 pounds?
>
> A        Not free lift, no.  *He'd have a forklift available or he'd have
> other employees available to help him lift something heavy.*
>
> . . . .
>
> Q        So my question is[:] it was not essential that Mr. McMillan
> was able to lift up to 60 pounds as a jet cutting machine operator; is
> that correct?
>
> . . . .
>
> A        I never told him or any employee in the company during my
> control they had to lift 60 pounds.  It was not a requirement of any
> employee to lift 60 pounds by themselves.

(Pharoah Dep., ECF No. 54-15 at 3:2–8, 4:23–25, 5:5–8.)  More generally, Mr. Pharaoh indicated

that the material cut ranged from "less than a pound to 40, 50, 60 pounds[.]"  (ECF No. 54-15 at

2:7–12.)

       With respect to the second point, Plaintiff has not conceded that he is unable to do the

physical duties that constitute his essential job functions as the Company suggests.  (*See, e.g.*, ECF

No. 51 at 14.)  Rather, Plaintiff indicates that, as it relates to lifting, loading, and unloading

materials used in the operation of the Water Jet, he "could not do it all 100 percent on [his] own."

(McMillan Dep., ECF No. 54-12 at 62:15–16.)  The question is whether Plaintiff has raised a

triable issue regarding whether his essential job functions required him to lift, load, or unload an

amount on his own that he can only lift, load, or unload with assistance.  He has done so by citing

evidence properly before this Court, including his own deposition testimony and the deposition

testimony of Chuck Pharaoh, Mark Price, and Zach Mellon.  (ECF No. 53 at 5–6, 14–16.)

Ironically, the very email cited by the Company as setting out the Plaintiff's essential job

functions explicitly states: "The operator of the jet is also *usually* responsible for overseeing *at

least one other technician who would be assisting in material handling* . . . ."  (ECF No 52-6 at 1

(emphasis added).)  In fact, Mr. Mellon testified in his deposition that "[b]efore [Plaintiff's]

injury . . . there was always one other person that was available to [Plaintiff] . . . to assist with heavy materials" and agreed that the person in question was a "full-time Lewis-Goetz employee." (Mellon Dep., ECF No. 54-14 at 13:24–14:4.)

The Company's reply with respect to this argument is simply unpersuasive and merits only a brief response on two points. First, the Company is seemingly of the view that Zach Mellon's email constitutes a "written job description" and therefore is irrefutable evidence of what it asserts are Plaintiff's essential job functions. (ECF No. 59 at 3.) This is not the law. California Government Code § 12926(f)(2) contains a non-exclusive list of evidence that may be considered in determining whether a particular function is essential, which the Company nowhere discusses. A "[w]ritten job description[] prepared *before advertising or interviewing applicants for the job*" is one such item. Cal. Gov. Code. § 12926(f)(2)(B) (emphasis added). However, such a written job description is not "conclusive" in this "highly fact-specific inquiry." *Lui*, 211 Cal. App. 4th at 971, 977. It follows *a fortiori* that Zach Mellon's email written weeks before Plaintiff's termination is also not conclusive.

Alternatively, the Company suggests that even if lifting 50–100 pounds is not an essential job function the Company is nonetheless entitled to summary judgment because Plaintiff "never recovered to the point where he could do *any* lifting with his left hand" and that Plaintiff "cannot credibly argue that the Waterjet Operator position did not involve *any* lifting, or that he was able to perform the lifting function of [his] job[.]" (ECF No. 59 at 2–4 (emphasis retained).) The first point is disingenuous. Among other things, it is clearly contradicted by *the Company's own opening brief* which acknowledges there is evidence that Plaintiff could lift 15–20 pounds with his left hand. (*See, e.g.*, ECF No. 51 at 14.) The second has already been addressed and requires no further discussion.

### iii. Whether the Company's Reasons for Termination were Pretext

The Company argues that Plaintiff "has no evidence" showing its "stated reason for firing him was pretext masking a discriminatory intent." (ECF No. 51 at 17.) The Court disagrees. Ironically, it is necessary to clarify that the "stated reason" referred to in the Company's brief is the reason given by Mark Price in his deposition — Plaintiff's allegedly unexcused absences —

11

not the content of the termination letter sent to Plaintiff.  (*Compare* ECF No. 51 at 15–16 *with* ECF No. 54-9.)  In any event, Plaintiff has cited evidence in his opposition from which a reasonable jury could conclude as follows: First, Plaintiff was fired due to the Company's perception that he was mentally and physically disabled due to his Crohn's Disease.  Second, the Company's supposed insistence on a doctor's certification in connection with the absence that ostensibly lead to his termination was disingenuous, as Plaintiff testified he was permitted to return to work after an absence of similar duration for his hand injury without such a certificate.  Third, key witnesses in this case were encouraged not to disclose to Plaintiff the true reason for his termination.

With respect to the first point, Plaintiff cites an email written by Ms. Zenti on March 1, 2013, seemingly cc'ing Zach Mellon and Chuck Pharaoh, informing Ms. Hale that the Sacramento branch is facing a "situation with an employee that has never occurred before" and asking for advice how to proceed.[5]  (ECF No. 54-6 at 2.)  She identified Plaintiff by name and indicated he is "ill with Crohn's Disease."  (ECF No. 54-6 at 2.)  She relayed to Ms. Hale that "*[t]he progression of his illness* has reached the point where his supervisor, Zach Mellon, and the store manager, Chuck Pharaoh, do not believe [Plaintiff] has the physical or mental capability to perform the work duties required of him[.]"  (ECF No. 54-6 at 2 (emphasis added).)  Ms. Zenti testified that she acquired this information from Mr. Mellon and Mr. Pharaoh.[6]  (Zenti Dep., ECF No. 54-17 at 9:22–10:4.)  This is consistent with Zach Mellon's own deposition testimony that, among other things, he perceived Plaintiff to be exhibiting "very, very, very strange behavior" the week before Plaintiff was involuntarily committed.  (*See, e.g.*, ECF No. 54-14 at 6:4–7.)  Mr. Mellon expressed concern that Plaintiff's perceived deterioration rendered him unable to act as "informal foreman" overseeing the other employees working in Plaintiff's department.  (ECF No.

---

[5]     The relevant sentence of Plaintiff's proffered statement of fact suggests the recipients of the email are the Company's "management team."  (ECF No. 60 at ¶ 43.)  The names are taken from the copy of the email attached as Exhibit F to the Michael Kim declaration.  (ECF No. 54-6.)

[6]     While Ms. Zenti remembered her conversation with Mr. Mellon, she admitted she could not specifically remember talking to Mr. Pharaoh.  (*See* ECF No. 54-17 at 10:5–16.)  However, she clarified that she did not "think [she] would have put his name in there unless [she] had."  (ECF No. 54-17 at 10:5–9.)

54-14 at 8:8–9:25.)  A jury could conclude that this is precisely what the termination letter is adverting to when it states that part of the reason his "absence [was] unexcused and your employment [was] terminated" was "*because of your troubling behavior both prior to* and on *February 1, 2013*[.]"  (ECF No. 54-9 (emphasis added).)

With respect to the second point, Plaintiff testified as follows:

> Q.    Did your doctors, any of your doctors who treated you for your hand injury, did any of them provide you with a written release to go back to work in March of 2012?
>
> A.    No.
>
> Q.    Did [the Company] ask for one, a written release?
>
> A.    I don't think so.
>
> . . . .
>
> Q.    Okay.  But upon your return to work at [the Company], were you provided -- did any treating medical provider give you restrictions on what you could or could not do in returning to work?
>
> A.    Not until -- not until March 16th, when I asked them about it.
>
> . . . .
>
> Q.    Okay.  When you went back to work on March 10th, did your doctors know that you were returning to work?
>
> A.    No.
>
> Q.    Why didn't you check with them to make sure it was okay for you to go back to work?
>
> A.    My honest answer to that is because I felt threatened that I was getting ready to lose my job, and I needed to get back. . . . Zach Mellon came to my house and had a talk with me about work and and things and the injury and when did he think that I would be able come back.  And I felt that was kind of as a threat and needed to get back to work ASAP . . . .

(ECF No. 54-12 at 28:1–6, 15–20, 30:2–16.)  Whether Plaintiff's testimony is credible is a question for a jury.  If his testimony is credited, a reasonable jury could conclude the Company's proffered explanation — that it terminated Plaintiff for failure to provide a doctor's certification in connection with an absence — was a ruse to hide its true motivation rather than adherence to policy.

13

With respect to Plaintiff's contention that key witnesses in this case were encouraged not to discuss the real basis for his termination, Plaintiff cites an email sent on March 26, 2013, by Christine Hale to Zach Mellon, seemingly cc'ing Mark Price, Chuck Pharaoh, and Merrilee Zenti.[7] This email indicates Ms. Hale has just sent Plaintiff his termination letter and contains the following sentence: "For the most part, the less said to [Plaintiff] about the reasons for his termination, the better." (ECF No. 54-10 at 1.)  A reasonable jury could conclude from an email of this sort, sent by an HR manager to three superiors of a fired employee, that the Company had something to fear, e.g., legal liability, if Plaintiff were to fully understand the reasons he was fired.

In sum, Plaintiff has cited specific evidence from which a jury could conclude that the reason offered for terminating Plaintiff's employment was pretext for a discriminatory motive. Nothing offered in the Company's reply changes this, although one argument requires brief mention.  The Company suggests Plaintiff's submission failed to demonstrate pretext as required in the third stage of the *McDonnell Douglas* burden-shifting analysis because Mark Price testified that it was his decision to fire Plaintiff and Mark Price says he did so for a non-discriminatory reason.  (ECF No. 59 at 5–7.)  This argument fundamentally misapprehends the rationale underlying the *McDonnell Douglas* test and the function of the third stage of that test.

An employee in an intentional discrimination case can recover without the employer's decision maker confessing he took an adverse employment action against the plaintiff for discriminatory reasons.  Direct evidence of this sort is "rare" because "employers now know better."  *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 662 (9th Cir. 2002); *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (noting that "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes" in discrimination cases).  It is certainly not required.  *See, e.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).  As the Supreme Court has explained, "[c]ircumstantial evidence is not only sufficient, but may also be *more certain, satisfying and persuasive than direct evidence*" in intentional

---

[7] The relevant sentence of Plaintiff's proffered statement of fact — which the Company does not dispute — indicates Christine Hale's email is addressed to "everyone."  (ECF No. 60 at ¶ 64.)  The names are taken from the copy of the email attached as Exhibit J to the Michael Kim declaration.  (ECF No. 54-10.)

discrimination cases. *Id*. (emphasis added). It is precisely for these reasons that the *McDonnell Douglas* test was developed. *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000) ("This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially.")

Where the employer satisfies its burden of production at the second stage by "set[ing] forth, through the introduction of admissible evidence, the reasons for" the challenged adverse employment action, this does not end the case. *See Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002). At this point, the employee must be given the "opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." *Guz*, 24 Cal. 4th at 356. "It is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case." *Wills v. Superior Court*, 195 Cal. App. 4th 143, 170 (2011). "Proof that the defendant's explanation is unworthy of credence . . . may be quite persuasive" circumstantial evidence of discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).

Here, Mark Price has testified that the decision to fire Plaintiff was his and that he did this due to Plaintiff's unexcused absences. (*See, e.g.*, ECF No. 52-3 at 18:7–23, 21:3–8.) In particular, Mr. Price stated that in order to return, Plaintiff would have had to provide "any type of doctor's excuse or notification that [he] is fit for duty." (ECF No. 52-3 at 11:15–20.) Mr. Price clarified that in his view the unexcused absences included both the time Plaintiff was involuntarily committed and the time after his discharge from the hospital. (ECF No. 52-3 at 18:7–23.)

However, the text of the termination letter sent to Plaintiff does not say that Plaintiff's failure to produce a doctor's certification was the sole reason he was fired. (*See* ECF No. 54-9.) The deposition testimony of Zach Mellon and Christine Hale does not say this either. (*See, e.g.*, ECF No. 54-14 at 11:9–14 (Mr. Mellon testified that he understood Plaintiff to have been fired because Plaintiff "did not contact EAP."); Hale Dep., ECF No. 54-13 at 26:6–14 (Ms. Hale agreed that a "fair summary" for the reasons for Plaintiff's termination included "his failure to contact EAP [and] his failure to sign and return the EAP authorization form back to Lewis-

Goetz").)  In its reply, the Company suggests that a jury might view these seeming inconsistencies as mere verbal variations of a "central theme" — Plaintiff was fired for not following several of the Company's policies implicated by his absence.  (ECF No. 59 at 6–7 n.2.)  Or, they might not.  Whether Mr. Price is telling the truth is a question for a jury that cannot be resolved on a motion for summary judgment.

For the foregoing reasons, the Motion for Summary Judgment is DENIED with respect to the First Cause of Action.

### B.  Second Cause of Action: FEHA Failure to Accommodate

The Company contends that Plaintiff's Second Cause of Action fails as a matter of law for two reasons.  First, the Company argues that Plaintiff "is not a 'qualified individual' because he cannot perform an essential function of his job (heavy lifting) either with or without accommodation."  (ECF No. 49 at 2.)  Second, the Company argues Plaintiff "admits that [the Company] provided him with the only accommodation he ever requested[.]"  (ECF No. 49 at 2.)  The Court finds that the Company is not entitled to summary judgment for either reason and will discuss them in turn.  However, the Court will first briefly set out the legal standard for a failure to accommodate claim under FEHA.

### i.    Legal Standard

FEHA "prohibits an employer from 'fail[ing] to make reasonable accommodation for the known physical or mental disability of an . . . employee.'"  *Lui*, 211 Cal. App. 4th at 971 (quoting Cal. Gov't Code § 12940(m)).  The essential elements of a FEHA failure to accommodate claim are as follows: (i) "the plaintiff has a disability under . . . FEHA," (ii) "the plaintiff is qualified to perform the essential functions of the position," and (iii) "the employer failed to reasonably accommodate the plaintiff's disability."  *Scotch*, 173 Cal. App. 4th at 1009–10.  The test for whether one is a "qualified individual" for purposes of a FEHA failure to accommodate claim is "identical" to the one used for a FEHA disability discrimination claim.  *Nealy*, 234 Cal. App. 4th at 378.  "[T]he reasonableness of an accommodation is generally a factual question."  *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 228 n.11 (1999).  Similarly, "[t]he reasonableness of the employer's efforts to accommodate is determined on a case by case basis."  *Soldinger v. Nw.*

16

*Airlines, Inc.*, 51 Cal. App. 4th 345, 370 (1996).  "Despite a pattern of successful accommodation, a single failure to accommodate an employee's disability may be actionable" under FEHA. *Gardner v. Fed. Express Corp.*, 114 F. Supp. 3d 889, 902 (N.D. Cal. 2015) (citing *A.M. v. Albertsons, LLC*, 178 Cal. App. 4th 455, 465 (2009)).

### ii.    Whether Plaintiff is a "Qualified Individual"

The Court's analysis for the First Claim is equally applicable here regarding whether Plaintiff is a "qualified individual."  Consequently, for the reasons already discussed, the Court finds that Plaintiff has raised a triable issue on this point.

### iii.    Whether Plaintiff received the only accommodation he requested

The Company argues that Plaintiff's claim fails as matter of law because Plaintiff "admits the <u>only</u> accommodation he ever asked for was for help in performing the physical portions of his job," the Company agreed to provide this accommodation, and the Company actually provided it. (ECF No. 51 at 20 (emphasis retained).)  The Company cites the deposition testimony of Mark Price and Zach Mellon for the proposition that Plaintiff was "assigned . . . light duty and directed . . . not to lift anything with his injured hand."  (ECF No. 51 at 20.)  Further, the Company argues that Plaintiff "admits [the Company] assigned Zach Thomas to perform the physical parts of [Plaintiff's] job" and, "[a]fter Thomas complained about the assignment, [the Company] hired and assigned no less than three temporary employees . . . to perform the physical parts of [Plaintiff's] job while he recuperated."  (ECF No. 51 at 20 (emphasis removed).)

Plaintiff does not dispute this is the only accommodation that he requested or that the Company agreed to provide it to him.  Rather, Plaintiff contends it is a material issue of disputed fact whether the Company actually did accommodate him.  The Court agrees.  A reasonable jury could conclude from the portions of his deposition Plaintiff cites in his opposition that Plaintiff was not actually accommodated for the entirety of the period from when he returned from his hand injury though his termination date.  These are summarized briefly below.

Plaintiff testified that, "about a week to two weeks" after his return to work, Plaintiff was "left kind of on [his] own to do things again" because Zach Thomas "no longer wanted" to help him.  (ECF No. 54-12 at 41:25–42:3.)  Plaintiff explained that he complained to Zach Mellon that

17

he "need[ed] help out there to do the physical work" after Zach Thomas stopped assisting Plaintiff. (ECF No. 54-12 at 43:19–20.) Plaintiff testified that to his knowledge Mr. Thomas was not ordered to continue to help him and there was a period of "at least two weeks until they ended up getting a temp[.]" (ECF No. 54-12 at 43:25–44:9.) Plaintiff testified that he did physical work during this period of time, as well as after. (*See* ECF No. 54-12 at 47:15–48:5.) Plaintiff indicated that even when an assistant was available "[a]t least 25 percent" of his work week was spent doing physical labor helping move material. (ECF No. 54-12 at 48:20–23.) Plaintiff testified that he was "yell[ed] at" and told to "just go home," or asked why he "doesn't just quit and go on disability" on a number of occasions by Zach Mellon and Jennifer Belcastro when he complained about being in pain or physically unable to do something. (ECF No. 54-12 at 52:6–54:12.) He was unsure the precise number of times Ms. Belcastro did this, but he testified Mr. Mellon had done this "two to three" times. (*See, e.g.*, ECF No. 54-12 at 53:6–54:3.) Plaintiff further testified that he was directed to make mechanical repairs on his own on three specific occasions and provided a detailed discussion of the circumstances surrounding those occasions. (ECF No. 54-12 at 54:22–60:23.) At least two of those occasions were in the period between when Zach Thomas stopped assisting Plaintiff and a temporary worker was hired. (ECF No. 54-12 at 55:8–13, 58:15–19.)

One point in the Company's reply warrants brief discussion. The Company seems to suggest that it is entitled to summary judgment because it "went out and hired temporary workers for the sole purpose of giving [Plaintiff] assistance with the physical parts of his job." (ECF No. 59 at 8.) Assuming that it did hire these workers solely for this purpose, this does not end the analysis. The third element of a failure to accommodate claim asks whether the "employer failed to reasonably accommodate the plaintiff's disability." *Scotch*, 173 Cal. App. 4th at 1010. It does not ask whether the employer and its management usually reasonably accommodated an employee's disability and remained well-intentioned on the occasions when they fell short. In *Albertsons*, the California Court of Appeals specifically rejected the employer's argument that a manager's failure to accommodate an employee's disability on a single occasion "was trivial . . . in the context of a much longer period of successful accommodation" as inconsistent with the

18

purpose of FEHA. *Albertsons*, 178 Cal. App. 4th at 464–65 (noting "[t]he statute does not speak of a pattern of failure"). Simply put, Plaintiff has submitted ample evidence from which a reasonable jury could find that Plaintiff's disability was not always reasonably accommodated after he returned to work on March 10, 2012, particularly if the jury accepts Plaintiff's testimony regarding the alleged gap period between when the Company seemingly allowed Zach Thomas to stop assisting Plaintiff and when a replacement was hired.

For the foregoing reasons, the Motion for Summary Judgment is DENIED with respect to the Second Cause of Action.

C. <u>Third Cause of Action: FEHA Failure to Engage in an Interactive Process</u>

The Company argues that Plaintiff's Third Cause of Action fails as a matter of law because "Plaintiff admits that [the Company] provided him with the only accommodation he ever requested and has not produced any record evidence that he asked for an accommodation that [the Company] did not consider." (ECF No. 49 at 2.) For the reasons discussed below, Court disagrees. However, the Court will first briefly set out the legal standard for a failure to engage in an interactive process claim under FEHA.

*i. Legal Standard*

"Under FEHA, an employer must engage in a good faith interactive process with the disabled employee to explore the alternatives to accommodate the disability." *Nealy*, 234 Cal. App. 4th at 379 (citing Cal. Gov't Code § 12940(n)). "FEHA requires an informal process with the employee to attempt to identify reasonable accommodations, not necessarily ritualized discussions." *Id.* "Although it is the employee's burden to initiate the process, no magic words are necessary, and the obligation arises once the employer becomes aware of the need to consider an accommodation." *Scotch*, 173 Cal. App. 4th at 1013. "Once the interactive process is initiated, the employer's obligation to engage in the process in good faith is continuous." *Id.* "[T]he employers obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed." *Id.*

19

*ii.     Whether Company failed to engage in an interactive process*

Plaintiff has raised triable issues of material fact that preclude the entry of summary judgment in favor of the Company on the Third Cause of Action. The discussion will necessarily be brief. The Company's argument is premised on the proposition it actually provided the reasonable accommodation that Plaintiff requested throughout the relevant period. The Court has already explained in detail why a reasonable jury need not reach this same conclusion on the evidence Plaintiff has submitted. If the jury so found, the Company's "obligation to engage in the interactive process [would] extend[] . . . and continue[] when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed." *Id.* Again, there is ample evidence in the record from which the jury could conclude the Company did not meet this obligation. As described above, Plaintiff testified that on two or three occasions he was "yell[ed] at" and told to "just go home" or was asked why he "doesn't just quit and go on disability" by his direct supervisor when he complained about being in pain or physically unable to do something. (ECF No. 54-12 at 52:6–54:12.) Further, Plaintiff testified that on one occasion Plaintiff told his direct supervisor: "I didn't understand how he expected me to [perform a repair on the Water Jet] with 26 stitches in my hand and my hand in a splint." (ECF No. 54-12 at 56:17–19.) According to Plaintiff, Zach Mellon responded: "[g]o figure it out and go f'ing do it." (ECF No. 54-12 at 56:20–21.) Notably, Plaintiff testified this was during the period after Zach Thomas stopped assisting him but before the first temporary worker started. (ECF No. 54-12 at 55:8–10.)

For the foregoing reasons, the Motion for Summary Judgment is DENIED with respect to the Third Cause of Action.

D.  Fourth Cause of Action: Violation of California Public Policy

The Company argues that Plaintiff's Fourth Cause of Action "is derivative [of his First Cause of Action] and fails as a matter of law for the same reasons." (ECF No. 49 at 2.) As the Company failed to demonstrate it was entitled to judgment as a matter of law on Plaintiff's First Cause of Action, the Motion for Summary Judgment is likewise DENIED with respect to the Fourth Cause of Action.

# V.    ANALYSIS OF MOTION TO COMPEL/MODIFY SCHEDULING ORDER

The Company argues that "Plaintiff did not allege at any point in his Complaints or through discovery that his employment by [the Company] caused him to develop . . . psychiatric issues." (ECF No. 43 at 4.)  However, the Company contends it learned that Plaintiff intends to offer expert opinion from two psychologists, David Pingitore, Ph.D., and Steve Sandoval Martinez, Ph.D., that "Plaintiff's employment with [the Company] and [the Company's] mistreatment [of him] during Plaintiff's employment *caused* the Plaintiff's psychiatric issues, including depression with suicidal ideation and paranoia and psychotic reaction." (ECF No. 43 at 5 (emphasis retained).)  Consequently, the Company has moved to compel Plaintiff to undergo a mental examination and to modify the scheduling order for the purpose of allowing time for this examination.  The Court will first analyze whether the Company has met its burden for compelling a mental examination under Federal Rule of Civil Procedure 35 before turning to whether there is good cause to amend the Amended Scheduling Order (ECF No. 28).  In each instance, the Court will first set out the legal standard.

## A.  Rule 35(a): Mental Examination

### i.    Legal Standard

Rule 35(a) sets forth the requirements for ordering a mental examination.  It provides "[t]he court . . . may order a party whose mental . . . condition . . . is in controversy to submit to a . . . mental examination by a suitably licensed . . . examiner." Fed. R. Civ. P. 35(a)(1).  The "order . . . may be made only on motion for good cause [and] must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it." Fed. R. Civ. P. 35(a)(2).  Supreme Court precedent requires the party seeking the examination to "show that 'the mental or physical condition' of the party who is to be examined 'is in controversy,' and that there is 'good cause' for the examination." *Large v. Regents of Univ. of California*, No. 2:08-cv-02835-MCE-DAD, 2012 WL 3647485, at *3 (E.D. Cal. Aug. 22, 2012) (citing *Schlagenhauf v. Holder*, 379 U.S. 104, 117 (1964)).  However, "[e]ven when the 'good cause' and 'in controversy' requirements are met, the decision to order a Rule 35 examination still remains a discretionary one." *Hanna v. Fresno Cty.*, Case No. 1:14-cv-00142-

21

LJO-SKO, 2015 WL 7458691, at *3 (E.D. Cal. Nov. 24, 2015).

*ii.        Whether Plaintiff's mental condition is "in controversy"*

Although the Ninth Circuit "has not addressed the 'in controversy' requirement," numerous districts courts in the Ninth Circuit have applied the test enunciated by the district court in *Turner v. Imperial Stores*, 161 F.R.D. 89 (S.D. Cal. 1995), to determine whether this requirement is satisfied. *See, e.g.*, *Ortiz v. Potter*, No. 2:08-cv-01326 LKK KJN, 2010 WL 796960, at *2 (E.D. Cal. Mar. 5, 2010). Having reviewed the unpublished opinions of this district court applying the so-called "*Turner* test," the Court is persuaded that it is a useful tool for facilitating (and focusing) the Court's inquiry into whether the "condition as to which the examination is sought is really and genuinely in controversy." *Schlagenhauf*, 379 U.S. at 118. Under *Turner*, "'garden-variety' emotional distress is not sufficient alone to place a party's mental state in controversy." *Ortiz*, 2010 WL 796960, at *3. Rather, "the *Turner* test requires the party seeking to compel the mental examination to demonstrate that the party to be examined has claimed emotional distress *and* the presence of one or more of the following with respect to the proposed examinee": (i) "a claim for intentional or negligent infliction of emotional distress," (ii) "an allegation of a specific mental or psychiatric injury or disorder caused by the alleged conduct," (iii) "a claim of 'unusually severe' emotional distress," (iv) "an intent to offer expert testimony regarding the claimed emotional distress," or (v) "a concession that the mental condition is 'in controversy' within the meaning" of Rule 35(a). *Id.* at *2 (emphasis retained) (citing *Turner*, 161 F.R.D. at 95.)

As preliminary matter, the following sentence accompanies each of the first four causes of action in the first amended complaint: "As a direct and proximate result of said wrongful acts by [the Company], Plaintiff has suffered and will continue to suffer humiliation, shame, despair, embarrassment, depression, and mental pain and anguish, all to Plaintiff's damage in an amount to be proven at time of trial." (ECF No. 36 at ¶¶ 19, 28, 38, 47.)[8] This satisfies "the threshold requirement under *Turner*" — a claim for emotional distress. *Ortiz*, 2010 WL 796960, at *4.

_____

[8]        Two of these sentences do not include the word "mental" but are otherwise the same. (ECF No. 36 at ¶¶ 28, 47.)

Consequently, the Court now turns to the Company's arguments addressed to the additional *Turner* factors.

The Company asserts that Plaintiff plans to offer expert opinion testimony that he suffers from a mental disability that "includ[es] depression with suicidal ideation and paranoia and psychotic reactions[.]"  (ECF No. 43 at 9.)  In particular, the Company contends that Plaintiff will offer this expert testimony in support of his request for damages, including for the proposition that Plaintiff suffers from a "mental disability" caused by the Company's alleged mistreatment of him.  (ECF No. 43 at 8–9.)  The Company argues this satisfies at least one of the additional *Turner* factors.  The Court agrees.

In his opposition, Plaintiff suggests that he is "simply seeking to recover damages . . . [for] a 'garden-variety claim of emotional distress' normally associated with or attendant to the experience of an unexpected termination."  (ECF No. 46 at 5.)  However, conspicuous by its omission is any suggestion by Plaintiff that he does not firmly intend to offer expert testimony of precisely the sort described by the Company.  "Garden variety" claims of emotional distress do not allow for independent medical examination under Rule 35(a) because jurors do not need assistance of testimony from mental health professionals — including on behalf of Plaintiff — to explain ordinary feelings of hurt and disappointment.  *See Lacava v. Merced Irrigation Dist.*, No. 1:10-cv-0853 LJO DLB, 2011 WL 2118757, at *3 (E.D. Cal. May 2, 2011).  The district court has succinctly explained this point as follows:

> [T]here is no doubt that the ordinary person would suffer temporary distress if he were unlawfully terminated from employment he otherwise desired to retain.  There is *no need to conduct a mental examination, or have medical personnel testify to such*, for the very reason that such distress is normal and understandable by the lay factfinder.  That is, if the jury finds that defendant acted as plaintiff alleges, the concomitant ordinary distress is almost a given.  Expert testimony would be inadmissible.  Fed. R. Ev. 702 (expert testimony must assist the trier of fact in understanding evidence beyond the ken of most lay persons).

*Rund v. Charter Commc'ns, Inc.*, Civ. No. S-05-0502 FCD GGH, 2007 WL 312037, at *2 (E.D. Cal. Jan. 30, 2007) (emphasis added).

In this case, it is undisputed that Plaintiff was involuntarily committed and that he has

testified that he allegedly attempted suicide during or shortly after the period he claims he endured his employer's allegedly unlawful conduct.  (*See, e.g.*, ECF No. 46-1 at 92:14–16.)  Simply put, he cannot offer expert testimony that this same allegedly unlawful conduct caused him to be suicidal and experience psychotic reactions without putting his "mental condition" in controversy.  *Cf. Gavin v. Hilton Worldwide, Inc.*, 291 F.R.D. 161, 164 (N.D. Cal. 2013) (concluding the plaintiff's mental condition would have been in controversy "even if [she] had not alleged a separate claim for [intentional infliction of emotional distress], [because] she alleges that [the defendant] discriminated against her because of her mental disability, and that [the defendant's] conduct caused her to be hospitalized and to attempt to commit suicide").

Consequently, Plaintiff may remove his mental condition from being "in controversy" within the meaning of Rule 35(a) by expressly indicating he will "forego offering [expert] medical [or psychiatric] evidence to support [his] emotional distress damages."  *See Lacava*, 2011 WL 2118757, at *3.  Otherwise, at a minimum, the fourth additional *Turner* factor — "an intent to offer expert testimony regarding the claimed emotional distress" — is satisfied.  *Ortiz*, 2010 WL 796960, at *2 (citing *Turner*, 161 F.R.D. at 95).  The Court need not resolve whether or not the Company's argument can be shoehorned into other *Turner* factors as it is unnecessary to resolve this motion.[9]

> ### iii.  Whether there is "good cause" to order a mental examination

Although Plaintiff has not opposed the Company's motion on this ground, the Court must still satisfy itself that "good cause" has been shown for the mental examination within the meaning of Rule 35(a).  *Schlagenhauf*, 379 U.S. at 121.  To establish "good cause," the moving party generally must offer specific facts showing the examination is necessary and relevant to the case.  *See Gavin*, 291 F.R.D. at 165; *Ragge v. MCA/Universal Studios*, 165 F.R.D. 605, 609 (C.D. Cal. 1995).  Relevant factors courts consider include "the possibility of obtaining desired information by other means, whether plaintiff plans to prove [his] claim through testimony of

---

[9]  The Company suggests that permitting expert testimony of the sort it has described in connection with Plaintiff's generic allegation of emotional distress is "akin" to Plaintiff bringing a "claim for intentional infliction of emotional distress."  (ECF No. 43 at 9.)  It is far from obvious why this would be the case and the Company has cited no authority for this proposition.

expert witnesses, whether the desired materials are relevant, and whether plaintiff is claiming ongoing emotional distress." *Gavin*, 291 F.R.D. at 165. For the reasons already discussed, the Court proceeds from the understanding that Plaintiff is "claiming damage for emotional distress and he intends to prove it in part through expert testimony." *Impey v. Office Depot, Inc.*, No. C-09-01973 EDL, 2010 WL 2985071, at *21 (N.D. Cal. July 27, 2010). Here, "there appears to be no other means" by which the Company "can obtain the information needed to rebut" Plaintiff's expert testimony relating to his mental condition "without its own examination." *Id.* Consequently, having carefully reviewed the Company's submissions, the Court finds the Company has met its burden to show good cause.

> iv. *The Court's discretion to not order a mental examination*

Having found the Company has shown the "in controversy" and "good cause" requirements are satisfied, the Court declines to exercise its discretion to nevertheless deny the Company's motion. "One of the purposes of Rule 35 is to 'level the playing field' between parties in cases in which a party's physical or mental condition is in issue." *See Ragge*, 165 F.R.D. at 608. To deny the Company's motion in the circumstances of this case would not serve this purpose.

> v. *Time, place, manner, conditions, and scope of the examination*

The Company acknowledges a mental examination of Plaintiff cannot be ordered without first modifying the Amended Scheduling Order. Consequently, the Court will first address whether the standard for such a modification is met before discussing the particulars of the time, place, manner, conditions, and scope of the requested examination.

> B. Modification of the Scheduling Order

As a final pretrial conference has not yet taken place, the Court may modify the Amended Scheduling Order in this case upon a showing of "good cause." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992) (citing Fed. R. Civ. P. 16(b)). This includes a modification for the purposes of allowing the requested mental examination under Rule 35. *See, e .g.*, *Large*, 2012 WL 3647485, at *3. "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Johnson*, 975 F.2d at 609. Having

carefully reviewed the submissions of the parties, including the affidavits of counsel, the Court is convinced that the Company has shown good cause. There is nothing in the record to suggest that the Company was anything but diligent following the disclosure of Plaintiff's experts' reports.

Indeed, Plaintiff has not opposed the motion on this basis. Rather, Plaintiff argues that, assuming the Court was persuaded by the Company's Rule 35 argument, the Court should find that the Company had sufficient information from the pleadings and Plaintiff's deposition to make its determination to request an independent medical examination without waiting until it became necessary to request a modification to the Amended Scheduling Order. (ECF No. 46 at 2–3.) This "mistakenly implies that meeting some of the *Turner* requirements at an earlier point in the discovery process necessarily demonstrates that [a defendant was] dilatory in not requesting an [independent mental examination] earlier." *Large*, 2012 WL 3647485, at *5. In any event, Plaintiff presupposes the Company could have successfully moved this Court for such an examination without consideration of Plaintiff's experts' proposed testimony. As should be evident from the Court's analysis above, this Court would not have granted the instant motion absent the proposed expert testimony.

C.  Time, Place, Manner, Conditions, and Scope of the Examination

The Court will first address Plaintiff's request that no neuropsychological tests should be permitted. (ECF No. 46 at 3–5.) Plaintiff contends such tests are designed for "traumatic brain injury or some other forms of brain insult [sic] resulting in deficits" and these are not "in controversy" here. (ECF No. 46 at 4–5.) In response, the Company cites the declaration of Ronald H. Roberts, Ph.D., whom the Company has designated as the person it would have conduct the mental examination of Plaintiff. (ECF No. 47 at 5–6.) Dr. Roberts indicates that Plaintiff's experts opine that Plaintiff suffers from "multiple disorders," which he lists in his declaration, and that "[p]roblems with cognition are frequently associated with such disorders." (*See* Roberts Decl., ECF No. 47-2 at ¶¶ 5–7.) Consequently, Dr. Roberts contends use of neuropsychological tests are appropriate to evaluate the opinions of the experts he is being asked to rebut. Additionally, Dr. Roberts indicates he intends to select the "actual tests used" based in part on Plaintiff's "presenting complaints" at "the time of the examination." (ECF No. 47-2 at ¶

7.)

Plaintiff has not attempted to call into question the qualifications, expertise, or professionalism of Dr. Roberts.  (*See* ECF No. 46.)  Consequently, the Court "will not micromanage the examination" or selection of the precise tests Dr. Roberts views as necessary to test the opinions of the experts he is being asked to rebut.  *See Gavin*, 291 F.R.D. at 167.  Simply put, the Court "expects the examiner will act professionally and not subject" Plaintiff "to unnecessary inquiries."  *See id*. at 166–67.  Nothing in this order shall be construed as barring Plaintiff from filing a *motion in limine* relating to Dr. Roberts's proposed testimony at the appropriate time in accordance with the schedule provided in connection with the final pretrial conference.

For the foregoing reasons, the Court will order Plaintiff to undergo an independent mental examination as more particularly described in Section VI of this Order.

VI.    CONCLUSION

For the reasons set forth above, the Company's Motion for Summary Judgment is DENIED and the Company's Motion to Compel is GRANTED.  Accordingly, IT IS HEREBY ORDERED that:

1.  Unless Plaintiff files a notice with this Court within 14 days of this Order indicating he will not be offering expert testimony in support of his claims for emotional distress, Plaintiff shall submit to a mental examination conducted by Ronald H. Roberts, Ph.D., at a date and time to be agreed upon by the parties.  Such examination shall take place within 30 days of this Order, unless the parties submit a joint stipulation within that period agreeing to another time and date within 90 days of this Order.  This examination shall take place at 2000 Van Ness Avenue, Suite 512, San Francisco, CA 94109, unless the parties submit a joint stipulation agreeing to another location.

2.  The examination of Plaintiff by Dr. Roberts will be substantially identical in scope and duration to the one described in the second paragraph of Section V of the Company's opening brief (ECF No. 43 at 10:15–23).

3.  The Amended Scheduling Order (ECF No. 28) is hereby AMENDED to allow the

Company to conduct the above-described mental examination. Furthermore, it is AMENDED to provide the Company with 20 days after the date of Dr. Roberts's examination of Plaintiff to serve a rebuttal expert report.

IT IS SO ORDERED.

Dated: August 7, 2017

Troy L. Nunley
United States District Judge